**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY 1919 University Avenue West, Suite 515, Saint Paul, Minnesota 55104; *and* <br><br> NATURAL RESOURCES DEFENSE COUNCIL, INC. 40 West 20th Street, 11th Floor, New York, New York 10011; <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD TRUMP, President of the United States, in his official capacity; <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY; *and* <br><br> LEE ZELDIN, Administrator of the U.S. Environmental Protection Agency, in his official capacity; <br><br> *Defendants*. | **Case No.** 1:26-cv-287 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      On July 17, 2025, President Donald Trump seized on a narrow and, until last year, never-before-used provision of the Clean Air Act, 42 U.S.C. § 7412(i)(4), to exempt the entirety of the taconite iron ore processing industry for two years from the 2024 updates to the National Emission Standards for Hazardous Air Pollutants ("NESHAP") for the Taconite Iron Ore Processing source category (known as the "2024 Taconite Rule"). Proclamation No. 10958,

*Regulatory Relief for Certain Stationary Sources to Promote American Iron Ore Processing Security*, 90 Fed. Reg. 34,743 (July 17, 2025) ("Taconite Proclamation" or "Proclamation"). Taconite processing emits mercury—a known neurotoxin linked to IQ loss, deficiencies in attention-span, motor function, language, and visual spatial ability that is especially of concern for developing fetuses and young children—among other toxic air pollutants. After nearly 20 years of regulatory delay, the 2024 Taconite Rule established the first and only federally enforceable mercury emission standard for the taconite source category.

2.      Besides establishing mercury standards, the 2024 Taconite Rule revised the standards for hydrogen chloride and hydrogen fluoride ("acid gas") by directly regulating them rather than using particulate matter ("PM") emissions limits as a surrogate. EPA estimated that these more stringent emissions standards will reduce combined acid gas emissions by 719 tons per year (hydrogen chloride and hydrogen fluoride emissions by 683 tons per year and 36 tons per year, respectively) and mercury emissions by 247 pounds per year. *National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing*, 89 Fed. Reg. 16,420 (Mar. 6, 2024). EPA determined the 2024 Taconite Rule will reduce the risk or incidence of premature death, aggravated asthma, and non-fatal heart attacks. *Id.* at 16,421.

3.      EPA issued the 2024 Taconite Rule in part to comply with the D.C. Circuit's decision in *Louisiana Environmental Action Network v. EPA*, 955 F.3d. 1088 (D.C. Cir. 2020) ("*LEAN*"), which held that EPA must set emission standards for all unregulated hazardous air pollutants ("HAPs") emitted by a major source category when conducting its required 8-year technology review under Section 7412(d)(6) of the Clean Air Act. EPA's "gap filling" in the 2024 Taconite Rule established for the first time—as required under the *LEAN* Court's mandate—

standards for mercury emissions from the Taconite Iron Ore Processing source category. *See* 89 Fed. Reg. at 16,409.

4.      There are seven active and one indefinitely idled taconite iron ore processing facilities in the United States, located in Minnesota and Michigan as illustrated in Figure 1, below. President Trump's Taconite Proclamation exempts all of them, effectively suspending the 2024 Taconite Rule for two years and, putting communities at risk from toxic air pollutants emitted by taconite facilities. The eight facilities are owned by just two parent companies: U.S. Steel and Cleveland-Cliffs. The cost of compliance with the 2024 Taconite Rule is less than 1 percent of the annual sales revenue per ultimate owner. 89 Fed. Reg. 16,421. By granting these exemptions, President Trump has given a free pass to the industry to continue delaying controls at the expense of environmental protection and public health: due to these exemptions, facilities may continue to emit mercury in whatever amounts result from their operations with no federally enforceable emissions limit.



Image from https://www.edf.org/maps/epa-pollution-pass/ (last accessed Jan. 12, 2026)

5.      The never-before-used provision of the Clean Air Act invoked in the Taconite Proclamation allows the President to exempt a source from a hazardous air pollutant standard for up to two years only if "the technology to implement" the relevant standard is "not available" *and* if exempting the source "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4). Both predicates are not met here.

6.      In the fifty-five years since Congress enacted Section 7412(i)(4), no President had ever used that exemption authority. In just the first year of his second term, President Trump has done so seven times for more than 180 facilities. Besides the Taconite Proclamation that exempted the entire taconite iron ore processing industry from mercury standards, President Trump issued proclamations exempting nearly one-third of U.S. coal-fired power plants from mercury and other air toxics standards, nearly half of commercial sterilizers from ethylene oxide standards, 50 chemical manufacturers from ethylene oxide and other hazardous air pollutant standards, one of two primary copper smelters from mercury and other HAP standards, and all eleven coke oven facilities from applicable hazardous air pollutant standards.

7.      President Trump's far-reaching Taconite Proclamation grossly exceeds the bounds of the Section 7412(i)(4) exemption authority. The Proclamation exempts all operating facilities regulated by the 2024 Taconite Rule from complying with any part of the Rule without any standard or facility-specific analysis to show that any (let alone all) of the eight exempted facilities meet the statutory standard. The air pollution control technology needed to comply with the acid gas standards already exists at the majority of operating facilities and effectively controls both acid gas and mercury pollution. The technology needed to comply with the mercury standards has been piloted by taconite facilities and has been used for many years to effectively reduce mercury emissions from plants in other industries. That the control technology

for mercury has not previously been required for taconite ore processing due to the lack of federally enforceable emission standards—and thus that the technology has not been installed at those facilities—does not mean the technology to implement it is "not available."

8.     The scope, content, and context of the Taconite Proclamation show it for what it really is: a pretext to relieve polluters from working to comply with the 2024 Taconite Rule while EPA works administratively to repeal those critical protections. Congress explicitly prohibited the agency from staying the effective date of such a rule, during reconsideration, by more than three months. *See* 42 U.S.C. § 7607(d)(7)(B).

9.     The Taconite Proclamation violates the Clean Air Act and exceeds the President's lawful authority. Plaintiffs ask the Court to enter appropriate relief declaring the Proclamation unlawful and invalid and enjoining EPA and its Administrator from implementing or giving effect to it.

### JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under laws of the United States, including the Clean Air Act.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendants reside in this judicial district, and because a substantial part of the events giving rise to the claim occurred in this judicial district.

12.     The Court has authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All-Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

**PARTIES**

*The Plaintiffs*

13.     Plaintiff Minnesota Center for Environmental Advocacy ("MCEA") is a

Minnesota 501(c)(3) nonprofit organization with members residing across Minnesota and has

offices in St. Paul and Duluth. MCEA's mission is to use law and science to protect Minnesota's

environment, its natural resources, and the health of its people. MCEA has worked to reduce

pollution from the taconite industry and improve water quality for more than fifty years as a

means of protecting Minnesota communities, particularly those that are disparately impacted by

mercury emissions, such as Indigenous communities and those residing, working, and recreating

in Northeastern Minnesota. It has done so across multiple program areas, including Healthy

Communities, Northeastern Minnesota, and its Water program. MCEA was established in 1974

and is located at 1919 University Ave. W., Suite 515, St. Paul, Minnesota 55104. MCEA has

members that live, work, and recreate near facilities that received exemptions and the Taconite

Proclamation will directly harm these members by depriving them of the protections afforded by

the Taconite Rule.

14.     Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a national

501(c)(3) nonprofit environmental membership organization with hundreds of thousands of

members nationwide. NRDC's purpose is to safeguard the Earth—its people, its plants and

animals, and the natural systems on which all life depends. Part of NRDC's core mission is to

improve air quality and safeguard public health by combating hazardous air pollutant emissions.

NRDC has members that live, work, and recreate near facilities that received exemptions and the

Taconite Proclamation will directly harm these members by depriving them of the protections

afforded by the Taconite Rule.

15.     Plaintiffs' members live, work, and recreate in areas affected by the excess pollution that is and will be emitted from the exempted facilities. They are harmed by breathing air pollution from the exempted facilities and are concerned that exposure to hazardous air pollutants from the exempted facilities could have harmful effects on their health.

16.     Plaintiffs' members stood to benefit from the mercury and acid gas standards in the 2024 Taconite Rule, which existing facilities were required to comply with by March 8, 2027, the latest allowable timeframe in Section 7412(i)(3) of three years after the effective date of the Rule. Exempted facilities are now not required to comply with the emission controls in the 2024 Taconite Rule and will be able to emit toxic air pollution at higher levels than otherwise would be allowed. Plaintiffs and Plaintiffs' members are harmed by the excess emissions that will result from the Taconite Proclamation exemptions.

17.     Exposure to mercury, acid gases, and other hazardous air pollutants emitted by exempted facilities causes adverse health effects. These exemptions increase the likelihood of hazardous pollutant exposure and related harms in the communities surrounding the exempted facilities.

18.     Craig Beveroth is a member of MCEA. He owns a cabin on Lake Vermillion in Tower, Minnesota, less than 30 miles from the U.S. Steel Corp – Minntac facility. His cabin is a year-round residential home, and Mr. Beveroth resides in this cabin every other week in the summer and approximately once per month in the winter. When he travels to his cabin, Mr. Beveroth shops at one of several grocery stores in the area proximate to his cabin including the Walmart located one mile from the Minntac facility. Mr. Beveroth is concerned about mercury contamination and sulfation and the impacts of that pollution on Lake Vermillion. Due to these concerns about mercury contamination, he eats less fish from the area.

19.     Robin Raplinger is a member of NRDC. He lives in Virginia, Minnesota within three miles of the ArcelorMittal/Cleveland-Cliffs Minorca facility and five miles of the U.S. Steel Corp – Minntac facility. He has had a stroke in the past and is concerned that his health conditions will be exacerbated by living in an area that is in such proximity to the processing facilities. Mr. Raplinger spends significant time outdoors engaging in recreational activities including mountain biking, snowshoeing, and skiing on trails that are within one mile of the Minorca facility, and is concerned about the air pollution from the facilities getting into his own lungs during these outdoor activities. He also fishes in the Boundary Water Canoe Area Wilderness and is aware of advisories that warn against eating too many fish due to mercury accumulation in the fish. Although he recreationally fishes, he rarely eats the fish he catches due to concerns about mercury accumulation. He has taken measures including installing a reverse osmosis filtration system in his home because he is concerned about the negative health impacts of hazardous air pollutants from the taconite ore processing facilities. As a result of the Taconite Proclamation, Mr. Raplinger is concerned that the Minorca and Minntac facilities will emit more hazardous air pollutants during the two-year exemption period.

20.     Plaintiffs and their members are therefore harmed by the Taconite Proclamation exemptions.

*The Defendants*

21.     Defendant Donald Trump is the President of the United States. He resides and conducts his duties in Washington, D.C. He is sued in his official capacity.

22.     Defendant U.S. Environmental Protection Agency ("EPA") is a federal agency of the United States. Its mission is to protect human health and the environment, and

responsibilities include issuing and enforcing hazardous air pollutant standards, including the Taconite Rule at issue here. EPA is headquartered in Washington, D.C.

23.     Defendant Lee Zeldin is the Administrator of the U.S. Environmental Protection Agency. He resides and conducts his duties in Washington, D.C. He is sued in his official capacity.

**LEGAL BACKGROUND**

*The Clean Air Act's Program to Address Hazardous Air Pollution*

24.     Clean Air Act Section 7412, 42 U.S.C. § 7412, establishes the framework for EPA's regulation of "hazardous air pollutants" from stationary sources, including industrial facilities.

25.     "Hazardous air pollutants" for Section 7412 purposes are a group of 188 air pollutants determined by Congress and EPA to be particularly harmful to human health. Mercury and acid gases are hazardous air pollutants. Section 7412 requires EPA to regulate hazardous air pollutants by issuing emissions standards for categories and subcategories of stationary sources of such pollutants. Emissions standards must require the maximum degree of reduction that EPA deems "achievable," taking into consideration cost and any non-air quality health and environmental impacts and energy requirements. *Id.* § 7412(d)(2).

26.     After EPA establishes Section 7412 standards for a source category, the Clean Air Act requires EPA to perform recurring reviews to ensure that the standards adequately address risks to health and welfare from hazardous air emissions and that they reflect advancements in technology and practice that allow sources to achieve even greater emission reductions. These reviews are often done together and are known as the "residual risk and technology review."

27.     In a technology review, EPA must "review, and revise" the Section 7412 standards "as necessary (taking into account developments in practices, processes, and control technologies)." *Id.* § 7412(d)(6).

28.     In a risk review, EPA determines whether unacceptable risk to public health remains, or is likely to remain, from hazardous air pollutant emissions even after the application of Section 7412 standards. If unacceptable risk remains, EPA must promulgate additional standards that eliminate the unacceptable risk, "provide an ample margin of safety to protect public health," and prevent "an adverse environmental effect." *Id.* § 7412(f)(2)(A).

29.     Congress also prescribed strict compliance schedules for Section 7412 standards. Residual risk-based emissions standards "shall become effective upon promulgation" for new sources, or 90 days after the effective date for existing sources. *Id.* §§ 7412(f)(3), (4). EPA may waive compliance for up to two years only if it determines "such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." *Id.* § 7412(f)(4)(B).

30.     For standards revised as the result of a technology review, EPA must require existing sources to comply "as expeditiously as practicable," and generally no later than three years after the effective date. *Id.* § 7412(i)(3)(A). EPA may grant a source up to one additional year to comply only where "such additional period is necessary for the installation of controls." *Id.* § 7412(i)(3)(B).

*Clean Air Act Procedural Requirements*

31.     The Clean Air Act sets out rulemaking requirements that apply to "the promulgation or revision of any . . . emission standard or limitation under Section 7412(d)." *Id.* § 7607(d)(1)(C). EPA must establish a rulemaking docket, publish a notice of proposed

rulemaking in the Federal Register, and provide a statement of basis and purpose for the rule that includes the factual data on which the proposed rule is based, the methodology used in obtaining and analyzing the data, and the major legal interpretations and policy considerations underlying the proposed rule. *Id*. § 7607(d)(3). EPA must also provide, along with the proposal, any comments by the Scientific Review Committee and the National Academy of Sciences and data, information, and documents on which the proposed rule relies. *Id*.

32.    The Clean Air Act also requires EPA to allow any person to submit written comment, and to provide an opportunity for oral presentation of data, views, or arguments, on a proposed rule. *Id*. § 7607(d)(5); *see also id*. § 7607(h). In promulgating a final rule, EPA must provide a statement of basis and purpose as required at the proposal stage and must explain major changes from the proposed to final rule. *Id*. § 7607(d)(6)(A). EPA must also provide a response to each of the significant comments, criticisms, and new data submitted during the comment period. *Id*. § 7607(d)(6)(B). EPA may not base a promulgated rule on "any information or data which has not been placed in the docket as of the date of such promulgation." *Id*. § 7607(d)(6)(C).

33.    The Clean Air Act also provides procedures for reconsidering a promulgated rule. The EPA Administrator can "convene a proceeding for reconsideration of the rule" but must "provide the same procedural rights as would have been afforded" in the original proceeding. *Id*. § 7607(d)(7)(B). The Clean Air Act states, however, that reconsideration "shall not postpone the effectiveness of the rule," except that the Administrator or a reviewing court may stay the effectiveness of the rule "for a period not to exceed three months." *Id*. Section 7607(d)(7)(B) is the sole authority EPA has to stay a rule after its effective date has passed. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

*Presidential Exemption Provision*

34.    Section 7412(i)(4) of the Clean Air Act authorizes the President, in narrowly prescribed circumstances, to "exempt any stationary source from compliance" with hazardous air pollutant standards promulgated under Section 7412, "for a period of not more than 2 years if the President determines [1] that the technology to implement such standard is not available and [2] that it is in the national security interests of the United States to do so." 42 U.S.C. § 7412(i)(4).

35.    The President may extend the original exemption "for 1 or more additional periods, each period not to exceed 2 years." *Id*.

## FACTUAL AND PROCEDURAL BACKGROUND

*Taconite Iron Ore Processing Industry NESHAP*

36.    In 2003, EPA promulgated the first hazardous air pollutant standards for taconite iron ore processing facilities at 40 C.F.R. part 63, subpart RRRRR. National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing, 68 Fed. Reg. 61,868 (Oct. 30, 2003) ("2003 Taconite Rule"). EPA completed a residual risk and technology review for the Taconite Rule in 2020. National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Residual Risk and Technology Review, 85 Fed. Reg. 45,476 (July 28, 2020) ("2020 Taconite Rule").

37.    The taconite iron ore processing facility source category comprises any facility engaged in the separation and concentration of iron ore from taconite to produce taconite pellets, including taconite ore crushing and handling operations, indurating furnaces, finished pellet handling operations, and ore dryers. *Id.* at 45,478. The taconite pellets produced by this source category serve as raw materials for the manufacture and production of steel. U.S. EPA, *Economic Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants:*

*Taconite Iron Ore Processing Amendments*, No. EPA-HQ-OAR-2017-0664-0309, at 1-1 (Jan. 2024). Currently, the U.S. has eight total taconite ore processing facilities, located in Minnesota and Michigan. One of these facilities, the Empire Mine in Ishpeming, Michigan, is idled and has no plans to resume operations. *Id*. at 3-2. The six operating taconite plants in Minnesota account for approximately half of the state's mercury emissions.

38.     Emissions from taconite iron ore processing facilities are a major driver of adverse health effects.

39.     Mercury is an environmentally persistent neurotoxin that bioaccumulates in humans and leads to especially troublesome health effects in developing fetuses and young children. 89 Fed. Reg. at 16,415, 16,421. Indigenous communities around the Great Lakes are particularly impacted by mercury exposure from taconite iron ore processing facilities because fish are an important subsistence resource for these communities. *Id.* at 16,414-16,415.

40.     Acid gases such as hydrochloric acid and hydrofluoric acid cause irritation and inflammation of the respiratory tract, heart attacks, asthma, and even premature death. *Id.* at 16,421; *see also* U.S. EPA, *Fact Sheet: Final Amendments to Air Toxics Standards for Taconite Iron Ore Processing*, https://perma.cc/WA9S-KS73.

*The 2003 Taconite Rule*

41.     In the 2003 Taconite Iron Ore Processing NESHAP, EPA promulgated the first maximum achievable control technology ("MACT") standards for the taconite source category under Section 7412(d). 68 Fed. Reg. 61,868. Because this was the initial regulation of HAPs from taconite processing, EPA's task was limited to establishing the MACT floor for new and existing major sources using the statutory formula set forth in Section 7412(d)(2)-(3), rather than conducting any risk review under Section 7412(f). *See id.* at 61,869.

42.     EPA identified the relevant affected emission points – ore crushing and handling, ore dryers, indurating furnaces, and finished pellet handling operations – and determined that these units collectively represent the predominant sources of HAP emissions in the source category. *Id.* at 61,869.

43.     The 2003 Taconite Rule included a descriptive summary of the health effects associated with taconite HAPs, including mercury, noting chronic and acute adverse effects on blood, the heart, kidneys, and the reproductive, respiratory, and central nervous systems. It further recognized that some of the HAPs emitted by this source category are carcinogens. *Id.* at 61,868.

44.     Although the 2003 Taconite Rule recognized mercury as a listed metal HAP emitted by taconite iron ore processing facilities, it did not set any emission standards for mercury. *Id.* at 61,869.

*The 2020 Taconite Rule*

45.     In 2020, EPA completed its required residual risk review under Clean Air Act Section 7412(f)(2) and technology review under Section 7412(d)(6) for the taconite source category. 85 Fed. Reg. at 45,479. It made no revisions to the numerical emissions limits of the 2003 Taconite Rule, only amendments to monitoring, compliance, and implementation. *Id.*

46.     At the time EPA conducted the 2020 risk and technology review, it found that risks due to emissions of air toxics from this source category, not including mercury, were acceptable and that the existing emission standards provided an ample margin of safety to protect public health and prevent adverse environmental effects. *Id.* at 45,484; *see also* U.S. EPA, *Residual Risk Assessment for the Taconite Iron Ore Processing Source Category in Support of*

*the 2019 Risk and Technology Review Proposed Rule*, No. EPA–HQ–OAR–2017–0664–0130 (Aug. 1, 2019).

47.     It determined that no revision of the 2003 MACT standards was warranted and therefore continued to rely on the existing 2003 standards which used PM as a surrogate for metal HAP emissions. 85 Fed. Reg. at 45,476, 45,479.

48.     EPA explained that Section 7412(f)(2) requires it to determine whether the existing MACT standards established in 2003 provide an "ample margin of safety" to protect public health and whether additional standards are necessary to prevent adverse environmental effects. *Id.* at 45,478. It went on to explain that it was required under Section 7412(d)(6) to review technological developments and revise MACT standards "as necessary," but that it read this as a "limited provision" that did not "direc[t]" the Agency to "develop new emission standards to address HAP . . .for which standards were not previously promulgated." *Id.* at 45,485. Notably, it acknowledged that "as [it] was preparing the final rule for signature, a decision was issued in *[LEAN]* in which the Court held that the EPA has an obligation to set standards for unregulated pollutants as part of technology reviews under CAA section 112(d)(6)" but that "[a]t the time of signature, the mandate in [*LEAN*] had not been issued and the EPA is continuing to evaluate the decision." *Id.* at 45,485 n.2.

49.     Accordingly, EPA did not comply with the *LEAN* mandate at the time of the 2020 risk and technology review. That compliance would not come until the 2024 Taconite Rule, when the Agency would address the regulatory gap and establish new standards for mercury emissions.

*The 2024 Taconite Rule*

50.     In the 2024 Taconite Rule, EPA promulgated revised NESHAP amendments for the taconite iron ore processing source category to close previously identified regulatory gaps

and to satisfy Clean Air Act residual risk and technology review obligations. 89 Fed. Reg. at 16,409.

51.     EPA discussed the health effects of mercury and acid gases, explaining that mercury is a persistent, bioaccumulative neurotoxin that poses particular risks to developing fetuses, children, and subsistence fishers like Tribal communities. *Id.* at 16,413-15. It acknowledged record evidence linking mercury deposition in the Upper Great Lakes Region to fish consumption advisories and adverse impacts on wildlife and human health. *Id.*

52.     Similarly, it explained that the rule would limit emissions of directly emitted particulate matter which would reduce non-fatal heart attacks, cases of aggravated asthma, and other adverse health effects. *Id.* at 16,421.

53.     The revisions EPA made were demanded by updated emissions data revealing that mercury, an unregulated HAP under the previous taconite rules, was being emitted from taconite iron ore processors. *Id.* at 16,409-10.

54.     The new emissions data prompting the review were acquired through a 2022 information collection request under Section 7414 of the Clean Air Act. *Id.* at 16,410; *see also id.* at 16,417 (citing David Putney, U.S. EPA, *Final Emissions Data Collected in 2022 for Indurating Furnaces Located at Taconite Iron Ore Processing Plants*, No. EPA-HQ-OAR-2017-0664-0301 (Sept. 2023)). In that information request, EPA gathered stack testing data on PM and acid gas emissions from indurating furnaces at all taconite facilities. It produced exhaust stack testing and a dataset much more robust and representative of current conditions, revealing that the indurating furnaces emit mercury. *Id.* at 16,417.

55.     The D.C. Circuit held in *LEAN* that EPA has an obligation to address regulatory gaps, such as missing standards for HAPs known to be emitted from a major source category,

when it conducts the eight-year technology review required by Section 7412(d)(6) of the Clean Air Act. 955 F.3d. at 1098-99.

56.     Consistent with *LEAN*, the Agency was obligated to establish standards for mercury emissions under the taconite iron ore processing NESHAP because mercury emissions were not regulated under the existing NESHAP. 89 Fed. Reg. at 16,409 (citing *LEAN*, 955 F.3d 1088).

57.     For mercury, EPA conducted a technology-based review as mandated in Section 7412(d)(2)-(3) to establish a MACT standard for the mercury emitted from taconite indurating furnaces. *Id.* at 16,409.

58.     In establishing the MACT floor for existing sources, EPA identified the five best-performing existing units with respect to each pollutant and used their emissions performance as the basis, consistent with Section 7412(d)(3). *Id.* at 16,414. EPA identified the five best-performing indurating furnaces based on stack test data received and calculated the MACT floor using a 99-percent upper prediction limit reflecting emissions achieved in practice by those units. *Id.* at 16,410-11. This method ensured that the floor reflects achievable performance while accounting for operational variability. *See id.* at 16,419. EPA finalized mercury emission limits of $1.4 \times 10^{-5}$ pounds of mercury emitted per long ton of taconite pellets produced for existing sources. *Id.* at 16,415.

59.     For new sources, EPA set the MACT standard equal to the emissions level achieved in practice by the single best-controlled similar source. *Id.* at 16,414. EPA finalized mercury emission limits of $2.6 \times 10^{-6}$ pounds of mercury emitted per long ton of taconite pellets produced for new sources, with an emissions-averaging compliance option for facilities with multiple furnaces. *Id.* at 16,415. This would reduce mercury emissions from taconite facilities by

about 247 pounds per year, which EPA expects to result in corresponding reductions in mercury deposition and improved public health outcomes. *Id.* at 16,420-21.

60.    EPA explained that, in setting the MACT floor, it may not consider cost, energy impacts, or economic feasibility because Section 7412(d)(2)-(3) requires the MACT floor to be based solely on emissions performance actually achieved in practice. *Id.* at 16,414.

61.    EPA found activated carbon injection systems to be an accessible control technology for complying with the new mercury standards. David Putney, U.S. EPA, *Development of Impacts for the Final Amendments to the NESHAP for Taconite Iron Ore Processing*, No. EPA-HQ-OAR-2017-0664-0307, at 6-7 (Jan. 29, 2024) ("Impacts of 2024 Rule Analysis"). An activated carbon injection system is an add-on air pollution control system that injects activated carbon or brominated activated carbon into the flue gas steam upstream of a particulate matter control device.The activated carbon absorbs mercury, and this mercury-laden carbon is then collected in the particulate matter control device. 89 Fed. Reg. at 16,437-38.

62.    The Agency also separately evaluated a range of add-on control technologies to determine whether standards more stringent than the MACT floor (beyond-the-floor standards) were warranted for mercury, but it ultimately declined to adopt beyond-the-floor mercury standards and finalized the mercury standards at the MACT floor. *Id.* at 16,415.

63.    EPA also set revised standards for acid gases following a technology review. *Id.* at 16,409. The Agency relied on the updated emissions data from the 2022 information request and corrected data errors identified through public comments from industry to derive revised MACT standards. *Id.* at 16,416-17. It explained that existing PM-based surrogate standards no longer accurately reflect current emissions performance or technological developments. *Id.* at 16,417.

64.     EPA recalculated the MACT floor for acid gases using corrected data and finalized numerical limits that reflect emissions achieved by the best-performing existing units. *Id.* at 16,416.

65.     The Agency found wet scrubbers and dry sorbent injection to be feasible control technologies to meet the revised acid gas standards. *Id.* at 16,417. A wet scrubber is an air pollution control device that removes PM and acid gases from a coal gas stream by introducing a liquid solution which dissolves the pollutants and is collected for disposal. U.S. EPA, *Control Cost Manual,* § 5, ch. 1, at 1-3 (Apr. 2021), https://perma.cc/6G6T-PYXF. A venturi scrubber[1] is a type of wet scrubber that cleans exhaust air by forcing it through a set of narrow parallel metal pipes, called venturi throats, where an injected liquid forms droplets that capture the pollutants. *Id.* at 1-5; 68 Fed. Reg. at 61,902. Dry sorbent injection systems inject an alkaline sorbent into the flue gas stream, where the sorbent reacts with acid gases to produce salts that are collected by a downstream particulate control device. Impacts of Final 2024 Rule Analysis, No. EPA-HQ-OAR-2017-0664-0307, at 11 (Jan. 29, 2024).

66.     A number of groups submitted public comment on the proposed rule. 89 Fed. Reg. at 16,410-19. In response to industry concerns about the proposed mercury MACT standards, EPA responded that it had incorporated the revised emissions data of several facilities shared by industry commenters and "recalculated the baseline emissions, MACT floor emission limits, emission reductions, and estimated capital and annual costs . . . for the final rule." *Id.* at 16,410. EPA further appropriately adjusted the estimated capital and operating costs for mercury controls

---

[1] In the final 2024 NESHAP, EPA identifies wet scrubbers as a feasible control technology to limit acid gas emissions. 89 Fed. Reg. at 16,417. The specific type of wet scrubber that EPA discusses in its technical memoranda as an accessible control option is called a "wet venturi scrubber." Impacts of Final 2024 Rule Analysis, No. EPA-HQ-OAR-2017-0664-0307, at 8-9 (Jan. 29, 2024).

based on industry commenters' provided information that costs were underestimated in the proposed rule. *Id.* at 16,411.

67.     EPA determined that the controls required by the 2024 Taconite Rule are feasible and reasonably achievable. It considered developments in practices, processes, and control technologies as well as the costs of compliance and determined that the facilities could achieve these standards in a manner that did not impose a significant financial burden on industry. *Id.* at 16,412, 16,414, 16,417. It further explained that six of the seven operational facilities would not need to install additional controls to comply with the revised MACT standards for acid gases and two of the seven would not need to install additional controls to comply with the MACT standard for mercury. *Id.* at 16,420, 16,423.

68.     EPA set March 8, 2027, as the deadline for all existing taconite facilities to comply with the requirements of the 2024 Taconite Rule. *Id.* at 16,425.

*EPA Announces Reconsideration, Solicits Exemption Requests*

69.     Industry groups complained about the 2024 Taconite Rule to the EPA Administrator in a letter dated June 14, 2024, where they stated that the final rule was one of a set of rules that would "undermine. . . national security." Pet'rs' Mot. Stay at 69, *Cleveland-Cliffs Inc. v. U.S. EPA*, Case No. 0:2024rev01211 (D.C. Cir. June 26, 2024), Doc. #2061787). Weeks later, the owners of the facilities subject to the 2024 Taconite Rule moved for a stay of the 2024 Taconite Rule. *Id.* at 8. They contended, among other arguments, that "there are no gaps to fill where EPA made an affirmative determination not to regulate" mercury, *id.* at 9, attempting to evade the *LEAN* court's unequivocal mandate. The D.C. Circuit denied the motion for stay, finding that industry groups had failed to make a "strong showing" that they were likely to succeed in arguments that EPA "was not required to regulate mercury emissions from taconite

iron ore processing facilities or that it should have considered costs in setting a floor standard."
Order Den. Pet'rs' Mot. to Stay at 2, *Cleveland-Cliffs Inc. v. U.S. E.P.A.,* Case No.
0:2024rev01211, Doc. #2078098 (D.C. Cir.), filed Oct. 3, 2024. The Court went on to hold that
the industry groups had also failed to demonstrate that their compliance costs were "certain and
great" during the time it would take for the Court to resolve the petitions for review. *Id.* at 3.

70.    On March 12, 2025, in a press event billed as "the greatest day of deregulation
our nation has seen," EPA announced that it would "reconsider" the 2024 Taconite NESHAP and
dozens of other regulations protecting human health and the environment. U.S. EPA, *EPA
Launches Biggest Deregulatory Action in U.S. History* (Mar. 12, 2025), https://perma.cc/EXL5-
FAMQ.

71.    Along with its press release, EPA published a "fact sheet" about its planned
reconsideration of the 2024 Taconite Rule and seven other recent hazardous air pollutant rules.
That fact sheet included an invitation that "[a]ny source interested in a Presidential exemption,"
from any of the eight rules "should provide their recommendations to EPA by March 31, 2025."
U.S. EPA, *National Emission Standards for Hazardous Air Pollutants (NESHAP): Powering the
Great American Comeback Fact Sheet* 3, https://perma.cc/E8UM-RN3K. It further explained,
"Sources need only provide why technology is unavailable and why it is in the national security
interests of the United States to provide the exemption." *Id.*

72.    Following up on its invitation to request exemptions, on or about March 24, 2025,
EPA posted a new webpage announcing it had established "an electronic mailbox to allow the
regulated community to request a Presidential Exemption under section 112(i)(4)." U.S. EPA,
*Clean Air Act Section 112 Presidential Exemption Information* (last updated Apr. 14, 2025),

https://perma.cc/WKL5-44FC. EPA asked that requests be submitted by March 31, 2025, a week after the webpage was posted.[2]

73.    EPA did not solicit any information from the public or provide any opportunity for public comment.

74.    Facility owners sent exemption requests to that email inbox. In a 9-page letter, Cleveland-Cliffs explained that it needed relief from the 2024 Taconite Rule because of the cost to evaluate compliance with the Rule. And in its own 14-page letter, the owner of the remaining processing facilities, U.S. Steel, requested an exemption because the Rule would require immediate actions that would unfairly burden it.

*The Taconite Proclamation*

75.    On July 17, 2025, President Trump issued a proclamation that exempted "certain stationary sources . . . as identified in Annex I of this proclamation" from the 2024 Taconite Rule "for a period of 2 years beyond the Taconite Rule's relevant compliance dates." Regulatory Relief for Certain Stationary Sources to Promote American Iron Ore Processing Security, 90 Fed. Reg. at 34,743. Every facility subject to the Taconite NESHAP was included in Annex I.

76.    The Taconite Proclamation cited "authority vested in [the President] by the Constitution and the laws of the United States, including section 112(i)(4) of the Clean Air Act, 42 U.S.C. 7412(i)(4)." *Id.* It stated that it "applies to all compliance deadlines established under the Taconite Rule, with each such deadline extended by 2 years from the date originally required for such deadline." *Id.*

---

[2] EPA removed much of the information it initially posted in an April 14, 2025 update to the webpage. *See* U.S. EPA, *Clean Air Act Section 112 Presidential Exemption Information* (last updated Apr. 14, 2025), https://perma.cc/WKL5-44FC.

77.    The Taconite Proclamation included what it referred to as two "determinations."
*Id.* at 34,743-44.

78.    First, the Taconite Proclamation purported to determine that "[t]he technology to
implement the Taconite Rule is not available," stating that "[s]uch technology does not exist in a
commercially viable form sufficient to allow implementation of and compliance with the
Taconite Rule by the compliance dates in the Taconite Rule." *Id.*

79.    Second, the Taconite Proclamation purported to determine that "[i]t is in the
national security interests of the United States to issue this Exemption for the reasons stated in
paragraphs 1 and 3 of this proclamation." *Id.* at 34,744. Paragraph 1 asserted that "[t]aconite iron
ore processing is fundamental to the United States' steel production and manufacturing sectors,"
and "[p]reserving and enhancing domestic taconite processing capabilities is vital to reducing
reliance on foreign sources and ensuring resilience of American industrial supply chains." *Id.* at
34,743. Paragraph 3 asserted that "[t]he Taconite Rule places significant burdens on a sector [the
steel industry] critical to the Nation's industrial foundation," and provides a compliance timeline
that "risks forcing shutdowns, reducing domestic production, and undermining the Nation's
ability to supply steel for defense, energy, and critical manufacturing." *Id.*

80.    The Taconite Proclamation and "Annex I" were published in the Federal Register
on July 23, 2025. *Id.*

81.    The Taconite Proclamation included no facility-, standard-, or technology-specific
determinations. Instead, the Taconite Proclamation broadly and conclusory purported to
"determin[e]" that the technology to implement the 2024 Taconite Rule (in its entirety) was not
available and that exemptions are in the national security interests of the United States.

82.     The Taconite Proclamation indiscriminately exempted an entire industry from compliance with the 2024 Taconite Rule. Indeed, it purports to exempt the Empire Mining facility in Ishpeming, Michigan from the 2024 Taconite Rule—a facility which is idle and has no plans to resume operations.

83.     The Taconite Proclamation's purported determination regarding technological unavailability is in direct conflict with EPA's findings that the technologies to implement the mercury and acid gas standards imposed by the 2024 Taconite Rule are used by facilities regulated by the 2024 Taconite Rule and other regulated sources.

*Technology to Implement the Rule's Requirements is Feasible*

84.     The Taconite Proclamation's unsupported determinations are unambiguously contradicted by factual evidence on the grounds of technological availability, including EPA's own findings and record for the 2024 Taconite Rule.

85.     *Controls for Acid Gas Standards*: Technology to implement the acid gas limits is accessible.

86.      EPA reviewed air pollution controls for acid gases and expressly stated that the controls "are available and cost-effective." 89 Fed. Reg. at 16,417.

87.     Wet venturi scrubbers are a demonstrated control technology that can be used to comply with the acid gas standard. EPA determined as much in the 2024 Taconite Rule.

88.     Wet venturi scrubbers are already being used by the majority of operating taconite plants to meet the preexisting PM standards. Impacts of Final 2024 Rule Analysis, No. EPA-HQ-OAR-2017-0664-0307, at 8 (Jan. 29, 2024). In fact, wet venturi scrubbers have been in use at many operating taconite plants for decades, even before the promulgation of the 2003 Taconite

NESHAP. 67 Fed. Reg. 77,562, 77,565 (Dec. 18, 2002); 68 Fed. Reg. 61,868, 61,884 (Oct. 30, 2003).

89.     Five of the seven operating facilities in this source category already use wet scrubbers to meet preexisting PM limits for the Taconite NESHAP. U.S. EPA. *Economic Impact Analysis for the Final National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments*, at 3-2 (Jan. 2024). At least four of those facilities use wet venturi scrubbers specifically. *Id.* at 3-3; David Putney, U.S. EPA, *Development of Impacts for the Proposed Amendments to the NESHAP for Taconite Iron Ore Processing*, No. EPA-HQ-OAR-2017-0664-0257, at 8 (Mar. 21, 2023). The MACT standard that EPA decided on in the 2024 Taconite Rule reflects existing, demonstrated performance. 89 Fed. Reg. at 16,419.

90.     Dry sorbent injection is a demonstrated control technology that can be used to comply with the acid gas standard. EPA determined as much in the 2024 Taconite Rule.

91.     In the 2024 Taconite Rule, EPA found that dry sorbent injection systems are low cost and have been used to control acid gas emissions since the late 1980s in industries such as coal-fired utilities, cement plants, pulp and paper mills, and brick kilns. Impacts of Final 2024 Rule Analysis, No. EPA-HQ-OAR-2017-0664-0307, at 11 (Jan. 29, 2024).

92.     Compliance with the acid gas standards imposed by the 2024 Taconite Rule will not require significant retrofits or additional controls.

93.     EPA estimated that all existing indurating furnaces would be able to comply with the revised hydrogen fluoride limits without add-on control devices. 89 Fed. Reg. at 16,416-17, 16423; *see also* National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing Amendments, 88 Fed. Reg. 30,917, 30,927 (May 15, 2023). The agency further estimated that all but two furnaces would be able to comply with the revised hydrogen chloride

limits without additional controls. *Impacts of Final 2024 Rule Analysis*, No. EPA-HQ-OAR-2017-0664-0307, at 10 (Jan. 29, 2024); *see also* 88 Fed. Reg. at 30,927. For the two furnaces that require additional controls to meet the revised hydrogen chloride standard, EPA found dry sorbent injection, with existing dry electrostatic precipitators, to be a feasible and cost-effective control option. *Impacts of Final 2024 Rule Analysis*, No. EPA-HQ-OAR-2017-0664-0307, at 11 (Jan. 29, 2024); 89 Fed. Reg. at 16,417.

94.     *Controls for Mercury Standards*: Technology to implement the mercury standards is accessible.

95.     Wet venturi scrubbers are a demonstrated control technology that can be used to comply with the mercury standard. EPA determined as much in the 2024 Taconite Rule.

96.     Wet venturi scrubbers, in addition to effectively controlling acid gases, also have the ability to control mercury. *Impacts of Final 2024 Rule Analysis*, No. EPA-HQ-OAR-2017-0664-0307, at 8-9 (Jan. 29, 2024).

97.     Activated carbon injection is a demonstrated control technology that can be used to comply with the mercury standard. EPA determined as much in the 2024 Taconite Rule.

98.     Activated carbon injection is a widely accessible control technology that can be used by taconite facilities to comply with the mercury standard. EPA identified activated carbon injection to be a "commonly used method[] for controlling mercury emissions." *Id.* at 8.

99.     EPA found activated carbon injection to be a feasible control technology because, when combined with venturi scrubbers that already exist at the majority of operating facilities in the source category, this technology enables each furnace to meet the new mercury standard. *Id.* at 8-9.

100.     Activated carbon injection systems have been a well-established technology for several decades, as far back as the 2003 Taconite NESHAP. 68 Fed. Reg. at 61,878, 61,880.

101.     Other regulated industries have used activated carbon injection to effectively control mercury emissions, such as facilities operating coal-fired boilers. *See* Minn. Pollution Control Agency, *Estimated Costs Related to the Implementation of the Mercury Reduction Rules*, No. EPA-HQ-OAR-2017-0664-0213, at 2 (July 2013); 68 Fed. Reg. at 61,880.

102.     Taconite facilities have piloted activated carbon injection systems, and test results found carbon injection to be the most feasible and least costly method of reducing mercury emissions compared to other controls. *See* Minn. Pollution Control Agency, *Estimated Costs Related to the Implementation of the Mercury Reduction Rules*, at 3-4.

103.     Compliance with the 2024 Taconite Rule only requires performance testing and establishment of operating limits for mercury and the installation of a continuous emission monitoring system. Many furnaces would meet the revised limits by using activated carbon injection in combination with existing or upgraded wet venturi scrubbers. Impacts of 2024 Rule Analysis, No. EPA-HQ-OAR-2017-0664-0307, at 9 (Jan. 29, 2024). In fact, using activated carbon injection systems in conjunction with preexisting wet venturi scrubbers would yield a maximum mercury removal efficiency of 85 percent. *Id.*

104.     EPA found that the combination of activated carbon injection systems and wet venturi scrubbers would allow facilities to meet the new mercury standards, and the revised acid gas limits, set forth in the 2024 Taconite Rule. *Id.* Venturi scrubbers are already installed at each furnace that requires additional controls to meet the new limits, and venturi scrubbers can remove acid gas and mercury emissions. Impacts of Final 2024 Rule Analysis, No. EPA-HQ-OAR-2017-0664-0307, at 9 (Jan. 29, 2024). The control combination of activated carbon

injection systems and venturi scrubbers allows facilities to effectively meet both acid gas and mercury limits.

105.    Industry commenters asserted that any updated MACT requirements would impose substantial capital and operating costs that would require multi-year outages and impossible equipment retrofits.

106.    EPA's docket demonstrates that these industry arguments are misdirected. EPA explained in the 2024 Taconite Rule that it was not possible to assess the accuracy of industry's proffered cost estimates where industry's capital cost information included no detailed breakdown from which to ascertain what was included in the purported cost and had little supporting documentation. 89 Fed. Reg. at 16,411-12.

107.    The 2024 Taconite Rule does not require major installation for most of the existing indurating furnaces in the first place. Although 11 of the existing indurating furnaces would require improved performance to comply with the mercury MACT floor limit, the Agency estimated that installation and operation of activated carbon injection with a high efficiency venturi scrubber would provide the level of required mercury reduction at these furnaces. 88 Fed. Reg. at 30,924.

*The Court's Equitable Authority to Review Ultra Vires Executive Action*

108.    The Taconite Proclamation exceeds the bounds of the President's Section 7412(i)(4) authority by granting sweeping exemptions to all of the regulated sources without making facility-, standard-, or technology-specific determinations.

109.    The Taconite Proclamation unlawfully amends the compliance dates of EPA's 2024 Taconite Rule, thus exceeding the bounds of Section 7412(i)(4). Section 7412(i)(4) is a narrow exemption applicable in specific statutorily defined circumstances; it does not give the

President authority to amend EPA standards or their compliance deadlines. Only EPA may amend those standards and only after notice-and-comment rulemaking.

110.    This Circuit allows for review of presidential actions to ensure conformity with statutory requirements, provided that "the authorizing statute or another statute places discernible limits on the President's discretion." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (citing, *inter alia*, *Chamber of Com. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)).

111.    The statutory provision at issue, Section 7412(i)(4), provides such discernable limits on the President's discretion by requiring a determination that, for specific facilities, "technology to implement" a standard "is not available" *and* that the exemption "is in the national security interests of the United States." 42 U.S.C. § 7412(i)(4).

112.    The Court therefore has authority to review the Taconite Proclamation to determine whether the President's exercise of statutory authority complied with the statutory conditions on that authority.

113.    Indisputable facts demonstrate that the President was applying an unreasonable construction of the statutory conditions under which he may exercise the Section 7412(i)(4) exemption authority.

114.    Because a necessary factual predicate required by the Clean Air Act—that the technology to implement "is not available"—is not present, the Taconite Proclamation unlawfully exercises authority not conveyed by Section 7412(i)(4).

115.    The Court has the power to declare that the Taconite Proclamation is unlawful and *ultra vires* because the necessary factual predicate required by the Clean Air Act is not present, and because the Taconite Proclamation unlawfully exercises authority not conveyed by Section

7412(i)(4), contrary to Congress's explicit restrictions on stay regulations and extensions of compliance deadlines.

## CLAIMS FOR RELIEF

### COUNT ONE:
### Unlawful Executive Action in Violation of the Clean Air Act
### (Nonstatutory Review for Violations of Federal Law by Federal Officials; Against All Defendants)

116.    Plaintiffs incorporate by reference Paragraphs 1-115.

117.    The President has limited authority to exempt stationary sources from duly promulgated hazardous air pollutant regulations solely by virtue of the authority delegated by Congress in 42 U.S.C. § 7412(i)(4). The President lacks any independent authority under the U.S. Constitution to issue the exemptions.

118.    Section 7412(i)(4) permits the President to exempt a source from a hazardous air pollutant standard only if "the technology to implement such standard is not available" and if an exemption "is in the national security interests of the United States."

119.    Section 7412(i)(4) establishes a judicially manageable standard with clear and precise limits of the sort federal courts routinely construe to determine whether officials have acted consistent with law.

120.    Whether technology to implement a standard is or is not available is a discrete, yes-or-no factual inquiry that limits the President's discretion to grant exemptions.

121.    There is no statutory basis for the President's indiscriminately broad determination that technology to implement the 2024 Taconite Rule is not available. The President patently misconstrued the statutory terms "technology" and "not available" in purporting to exercise the Section 7412(i)(4) exemptions authority.

122.    The Taconite Proclamation's purported determination that technology needed to implement the various new standards of the 2024 Taconite Rule is not available for all taconite iron ore processing facilities is a conclusory statement without specific findings as to any specific standard, any specific technology, or any specific facility.

123.    Technology to implement the 2024 Taconite Rule is in fact available. The relevant technologies to implement each aspect of the 2024 Taconite Rule standards are in use among facilities regulated by the 2024 Taconite Rule and/or similar regulated sources. The technology to implement the acid gas standards imposed by the 2024 Taconite Rule already exists at the majority of facilities in the source category, with minimal add-on controls required. And the technology to implement the mercury standards imposed by the 2024 Taconite Rule has been piloted by the taconite industry and used by other regulated industries to effectively reduce mercury emissions.

124.    The Taconite Proclamation's purported determination that technology to implement the various standards of the 2024 Taconite Rule is not available is unambiguously contradicted by factual evidence. The Taconite Proclamation contains cursory and conclusory statements without specific findings as to any particular standard, technology, or facility.

125.    The President's purported determination that the technology to implement the 2024 Taconite Rule is not available instead rests on an unlimited, untenable interpretation and application of the authority conveyed by Section 7412(i)(4) of the Clean Air Act.

126.    Because the President grossly exceeded the bounds of his statutory authority by purporting to exempt stationary sources from standards for which the technology to implement is available, the Taconite Proclamation is plainly in excess of the President's delegated powers and contrary to the statute's specific limitations on those powers.

127.    The President's action is contrary to the Clean Air Act and is *ultra vires*.

128.    The Court possesses inherent equitable power to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015). Congress has nowhere foreclosed review of the interpretation and application of 42 U.S.C. § 7412(i)(4). There is no alternative statutory procedure for review of Plaintiffs' claim.

129.    Because the Taconite Proclamation violates the Clean Air Act and is *ultra vires*, EPA actions implementing or giving effect to the Proclamation likewise violate the Clean Air Act and are *ultra vires*.

## COUNT TWO:
### Ultra Vires, De Facto Rulemaking Without Statutory Authority
### (Nonstatutory Review of Action in Excess of Statutory Authority by federal officer; against all Defendants)

130.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-115.

131.    Congress required EPA to provide for existing sources' compliance with hazardous air pollutant standards "as expeditiously as practicable" and set concrete boundaries on EPA's flexibility to set compliance deadlines "in no event later than 3 years after the effective date of such standard" with certain exceptions not relevant here. 42 U.S.C. § 7412(i)(3)(A).

132.    Congress gave EPA and state permitting authorities discrete, limited authority to grant an existing source "up to 1 additional year to comply with standards" promulgated under subsection (d) "if such additional period is necessary for the installation of controls." 42 U.S.C. § 7412(i)(3)(B).

133.    Congress further conferred discrete, limited authority on EPA to stay the effectiveness of rules, including hazardous air pollutant standards, for no more than three

months, during EPA's reconsideration of a rule under certain circumstances. 42 U.S.C. § 7607(d)(7)(B).

134.    Congress directed EPA to provide for public notice and comment on EPA actions to revise hazardous air pollutant standards, to alter their compliance dates, or to grant source-specific deadline extensions. 42 U.S.C. § 7607(d)(5), (h).

135.    The exemption authority conveyed in Section 7412(i)(4) must be construed congruously with the authorities and limitations Congress enacted in Sections 7412 and 7607.

136.    EPA and the President are bound by the Clean Air Act's duties with respect to implementing Section 7412(i)(4), including following rulemaking procedures, and being bound by lawfully adopted regulations.

137.    Reading Section 7412(i)(4) to authorize exemptions for the entirety of the regulated source category, from every single standard and other requirement of a rule, without facility- or standard-specific justifications tied to the statutory factors, is contrary to the context, purpose, and structure of the Clean Air Act.

138.    The content, context, and scope of the Taconite Proclamation demonstrates that the Proclamation is not a true "exemption" within the meaning of Section 7412(i)(4).

139.    The Taconite Proclamation's extremely broad sweep reflects an interpretation of the Section 7412(i)(4) authority that would swallow and render superfluous statutory limits.

140.    The Taconite Proclamation is functionally a rulemaking and/or stay pending reconsideration granted without observance of the procedural and substantive limitations Congress enacted in Sections 7412 and 7607 of the Clean Air Act.

141.    EPA explicitly invited requests for presidential exemptions explicitly in the context of its announced reconsideration of the 2024 Taconite Rule. It stated that the exemptions

are offered "while EPA reconsiders" the underlying rule. *See* EPA, Clean Air Act Section 112 Presidential Exemption Information, https://perma.cc/24UT-J3KW (last accessed Dec. 8, 2025).

142.    The President granted sweeping exemptions from all compliance obligations of the 2024 Taconite Rule to all regulated sources. He did so without particularized consideration of facilities and their particular products and processes, or of the specific standards, technologies, or practices needed to comply. All of these are necessary to determine whether technology is not available to implement the standards.

143.    The Taconite Proclamation's purported exercise of Section 7412(i)(4) exemption authority is in fact an exercise of rulemaking and/or stay authority despite the President lacking such power. The Clean Air Act gives only EPA that authority and only after following certain procedures in certain circumstances.

144.    The sweeping Taconite Proclamation exceeds the narrow bounds of Section 7412(i)(4) to achieve improper goals prohibited by other provisions of the Clean Air Act. In granting compliance relief that far exceeds the Section 7412(i)(4) authority, the President bypassed and contravened the statutory requirements on rulemaking and stays pending reconsideration to accomplish sweeping compliance exemptions unauthorized by law and in excess of the President's statutory authority.

145.    The Taconite Proclamation is beyond the authority conveyed by the Clean Air Act and is *ultra vires*.

146.    Because the Taconite Proclamation is beyond the Clean Air Act authority and *ultra vires*, EPA actions implementing or giving effect to the proclamation are similarly *ultra vires*.

## RELIEF REQUESTED

WHEREFORE Plaintiffs request that the Court:

A. Declare that the Taconite Proclamation is unlawful and invalid and that the Annex I sources remain subject to the 2024 Taconite Rule as promulgated;

B. Issue injunctive relief:

   i.   prohibiting EPA and Administrator Lee Zeldin from implementing, relying on, or giving effect to the Taconite Proclamation, including through implementation of the Clean Air Act's Title V operating permit program where applicable; and

   ii.  directing EPA to promptly notify, in writing, the operators of facilities listed in Annex I and relevant state, local, and/or Tribal permitting authorities that the Taconite Proclamation is unlawful and invalid, and that any facilities that the Taconite Proclamation purported to exempt may not lawfully delay or avoid compliance with the deadlines promulgated by the 2024 Taconite Rule by relying on the Taconite Proclamation.

C. Award Plaintiffs their fees and costs of litigation as authorized by law;

D. Grant such other relief as the Court deems just and proper.


Dated: February 2, 2026              Respectfully submitted,

                                     /s/ Shampa Panda
                                     Shampa Panda (D.C. Bar No. 90030605)
                                     Natural Resources Defense Council, Inc.
                                     1152 15th Street NW, Suite 300
                                     Washington, D.C. 20005
                                     spanda-bryant@nrdc.org
                                     Tel: (202) 836-9333

                                     /s/ Sarah A. Buckley
                                     Sarah A. Buckley (D.C. Bar No. 90035401)

Natural Resources Defense Council, Inc.
1152 15th Street NW, Suite 300
Washington, D.C. 20005
sbuckley@nrdc.org
Tel: (202) 836-9555

*Counsel for Plaintiffs Minnesota Center for Environmental Advocacy and Natural Resources Defense Council*